

## NUMBER 13-12-00608-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

---

**BILLY DEAN BUTLER,**                                                                 **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                                 **Appellee.**

---

### On appeal from the 156th District Court
### of Bee County, Texas.

---

## MEMORANDUM OPINION

### Before Justices Benavides, Perkes, and Longoria
### Memorandum Opinion by Justice Benavides

By one issue, appellant, Billy Dean Butler, appeals his conviction for aggravated kidnapping.   *See* TEX. PENAL CODE ANN. § 20.04 (West 2011).   Butler asserts that the trial court abused its discretion by admitting unauthenticated and inadmissible text messages into evidence.   We reverse and remand.

# I.   BACKGROUND

The State indicted Butler for the aggravated kidnapping of Ashley Salas on or about August 19, 2011 in Bee County. *See id.* Butler pleaded not guilty and was tried before a Bee County jury.

Salas was the State's main witness, and she testified in detail about the events that took place on August 19, 2011. Salas stated that she and Butler were dating at this time. Salas testified that she took a trip on August 18, 2011 to visit her ill grandmother in Kenedy County, Texas, when Butler called her and texted her numerous times stating that "whenever he caught [her] . . . [she] was going to get it." Butler arrived later that day to Salas's grandmother's house in Kenedy County, and he accused her of cheating on him. According to Salas, Butler drove away in her car, and he texted her later to tell her that she could find her vehicle parked "on the side of the highway." Later that night, Salas drove back to Bee County with her mother and found her car parked on the side of the highway. Salas drove her car to her mother's house in Bee County.

Later, Butler arrived at Salas's mother's house to tell Salas that he was sorry, but Salas asked Butler to leave. Salas testified that Butler left her mother's house, but returned a short time later and again accused her of cheating on him. Salas, again, asked Butler to leave, and he complied. Salas testified that Butler returned for a third time and apologized. Salas accepted his apology and rode with him in his car back to a house where they both resided at the time.

Salas testified that she and Butler drove about a block away from her mother's house before he again accused her of cheating on him. The next thing Salas remembers is that Butler began to hit her as he was driving. When the couple arrived at

the house, she refused to exit the vehicle, but Butler pulled her out of the vehicle and pushed her into the house. Salas stated that once inside of the house, Butler continued his questioning, punched her, and ripped off her clothes. According to Salas, the beating stopped at around 7 a.m. and she fell asleep. Salas testified that she woke up to Butler asking her what had happened to her, acting as if he did not know what had happened to her. Salas testified that her mother picked her up from the house and called for an ambulance to take her to the hospital. The trial court admitted images of Salas's injuries and medical records related to her treatment at the hospital following the alleged incident.

During cross-examination, Salas admitted to making a written statement to Butler's lawyer following the events of August 19, 2011. In this statement, Salas claimed that she entered Butler's home on the night of August 19, 2011 and found two girls sitting on Butler's couch, one of whom was Butler's ex-girlfriend. According to the statement, Salas stated that she proceeded to fight with the two girls inside of Butler's home and the two girls assaulted her, which led to her injuries. Salas also admitted to writing a letter to Butler, in which she expressed astonishment at the charges brought against him. Salas did not deny making the statements, but testified that they were all lies in order to keep Butler from going to prison.

Finally, over Butler's objections, the trial court admitted images of text messages taken from Salas's cellular phone purportedly sent by Butler to Salas the week before trial. The text messages, discussed in more detail later in this opinion, appeared to be a mix of incoherent ramblings and profanity-laced threats towards Salas regarding her testimony against him.

3

The jury found Butler guilty as charged, and the trial court sentenced him to fifty years' imprisonment with the Texas Department of Criminal Justice—Institutional Division. This appeal followed.

## II. ADMISSIBILITY OF TEXT MESSAGES

By one issue, Butler contends that the trial court reversibly erred by admitting unauthenticated and inadmissible text messages.

### A. Standard of Review

A trial court's decision on whether to admit evidence is reviewed under an abuse of discretion standard and will not be reversed if it is within the zone of reasonable disagreement. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011) (citations omitted). An abuse of discretion occurs when the trial court acts arbitrarily or unreasonably, without reference to guiding rules or principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990) (en banc). The inquiry on appeal is whether the result was reached in an arbitrary or capricious manner. *Id.* We afford trial courts "great discretion" in its evidentiary decisions because "the trial court judge is in a superior position to evaluate the impact of the evidence." *Id.* at 378–79.

### B. Discussion

The admitted evidence at issue involves the following text-message conversation, purportedly between Butler (from a phone number ending in 3899) and Salas:[1]

3899: And add this cuz ur fon is taped that y u tex I'll u myself bitch

3899: Pipe in ur mouth ho

3899: I can't wait your teeth r going in ur throat

---

[1] For purposes of the record, this exhibit was labeled as State's Exhibit 57.

| | |
|---|---|
| Salas: | Ok I said it once versus u saying it over 10 times ok mmm what u Don't b a pussy tell me |
| 3899: | Snithin ass bitch ur dead I hope u lived it out cuz ur scum snitching bitching ass. |
| 3899: | I'll start wit ur mono first pussy |
| Salas: | Who I can't understand ur writing |
| 3899: | Ur the pussy u run to the cops after u fuck me over |
| 3899: | Shut up bitch |
| Salas: | And wat?? |
| Salas: | Have some balls & take responsibly for your own ACTIONS |
| Salas: | U did the crime |
| 3899: | They sent u in there to take pics of me |
| 3899: | U deserved it |
| Salas: | I deserved wat |
| 3899: | Liers need that |
| 3899: | Lmfao |
| 3899: | Everyone counted |

Butler's argument on appeal is two-fold. First, Butler asserts that the text messages were improperly authenticated, *see* TEX. R. EVID. 901, and secondly, that such evidence was inadmissible under Rules 403 and 404(b). *See id.* R. 403, 404(b). In response, the State argues that Butler did not preserve error for appeal. We disagree and will address the merits of Butler's issue on appeal.[2]

---

[2] At trial, Butler's counsel made the following specific objection prior to the admission of the text messages, which was overruled:

I'm going to object to this exhibit being offered into evidence for lack of proper

5

## 1. Authentication

As a general rule, when authentication or identification is a condition precedent to admissibility, it is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. *See id.* R. 901. This may be accomplished a number of ways, as illustrated by the rule, such as by testimony of a witness with personal knowledge, comparison with other authenticated evidence, or by circumstantial evidence. *See id.* R. 901(b). While Rule 901 does not expressly address electronic communications, like those at issue in this case, courts and legal commentators have concluded that the rules of evidence in place are "generally 'adequate to the task.'" *Tienda v. State*, 358 S.W.3d 633, 639 (Tex. Crim. App. 2012) (quoting Steven Goode, *The Admissibility of Electronic Evidence*, 29 REV. LITIG. 1, 7 (Fall 2009)). Furthermore, the *Tienda* Court cited a "watershed opinion" from the federal courts on the issue of the admissibility of electronically stored/transferred evidence, which states that "any serious consideration of the requirement to authenticate electronic evidence needs to acknowledge that, given the wide diversity of such evidence, there is no single approach to authentication that will work in all instances." *Tienda*, 358 S.W.3d at 640*.* (quoting *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 553–54 (D. Maryland 2007)). But like the authentication of any proferred evidence, the best or most appropriate method for

---

predicate. I'm also going to be objecting under Rule 403 in that it's only offered to confuse the issue before the jury.

It's—I'm also going to object under Rules [sic] of Evidence 404 which is that it's being offered merely to attack the character of the defendant and not goes [sic] to any element of the crime alleged in the indictment.

Additionally, I believe it's unfairly prejudicial more than it's probative on the evidence in the case.

authenticating electronic evidence will often depend upon the nature of the evidence and the circumstances of the particular case. *See Tienda*, 358 S.W.3d at 640.

The court of criminal appeals recognized that printouts of electronic evidence, like text messages, have been admitted into evidence "when found to be sufficiently linked to the purported author so as to justify submission to the jury for its ultimate determination of authenticity." *Id.* (internal citations omitted). Such a prima facie showing of authenticity has been established when: (1) the sender admits authorship or was seen composing it; (2) business records of a cellular phone company have shown that the message originated with the purported sender's cell phone under circumstances in which it is reasonable to believe that only the purported sender would have had access to the cell phone; (3) the communication contained information only the purported sender could be expected to know; (4) the purported sender has responded to an exchange of electronic communication in such a way as to indicate circumstantially that he was in fact the author of the particular communication; or (5) other circumstances, peculiar to the facts of the particular case, have sufficed to establish at least a prima facie showing of authentication. *Id.* at 639–40 (internal citations omitted).

The *Tienda* Court also noted, however, that the "provenance of such electronic writings can sometimes be open to question" because "computers can be hacked, protected passwords can be compromised, and cell phones can be purloined. . . ." *Id.* at 641. As a result, evidence of a text message purporting to come from a cell phone number assigned to the purported author, without more, typically has not been sufficient to support a finding of authenticity. *Id.* at 641–42.

7

With this framework in mind, we turn to the facts of this case. The State attempted to authenticate the photos of the text messages through Salas's testimony, as shown by the following exchange prior to the evidence being admitted:

[PROSECUTOR]: What is Mr. Butler's phone number?

SALAS: 361-215-3899

[PROSECUTOR]: Does that number appear on all the pages of the exhibit?

SALAS: Yes.

[PROSECUTOR]: How do you know that that is Mr. Butler's telephone number?

SALAS: Because that's where he called me from and that is what's on the same exhibit in front of me.

[PROSECUTOR]: You've read the text messages in the exhibit?

SALAS: Yes.

[PROSECUTOR]: Who send [sic] you those text messages?

SALAS: He did.

[PROSECUTOR]: How do you know that it was him?

SALAS: Because he was the one texting me back and forth and he had even called in between the conversations talking mess [sic].[3]

Salas's testimony states that she had personal knowledge that it was Butler's telephone number because he had called her from that number before. This testimony,

_____

[3] We note that Salas generally testified that Butler had sent her a text-message photo of himself to her from the telephone number in question. However, the purported photograph is not part of State's Exhibit 57. Furthermore, no further details regarding this correspondence was elicited by the State, specifically: (1) when the photo was taken or sent, (2) what the photo purportedly depicted, (3) who took the photo; or (4) any other circumstances peculiar to this case regarding the photo or its sender. Accordingly, without more, we decline to use this testimony to support the trial court's finding of authenticity. *See* TEX R. EVID. 901(a); *see also Tienda v. State*, 358 S.W.3d 633, 641–42 (Tex. Crim. App. 2012).

8

without more, is exactly the type of evidence that the *Tienda* Court warned about in authenticating text messages. *See id.* If the State sought to authenticate the text messages solely through Salas, rather than through the cellular phone company or any other means, it could have done so by further developing Salas's testimony to include other circumstantial evidence that would have linked Butler to the text messages or to the telephone that was used to send the messages, such as whether Butler identified himself, how she knew it was Butler calling, or how she recognized his voice. *See id.* at 640; *see also Manuel v. State*, 357 S.W.3d 66, 76 –77 (Tex. App.—Tyler 2011, pet. ref'd) (finding sufficient authentication of defendant's phone number after complainant testified to receiving phone calls and voice mails from defendant over the course of three years in which defendant identified himself and later enabled the complainant to recognize his voice in other calls and identify his phone number in text messages).

In this case, however, the State did not develop Salas's testimony, as illustrated in *Manuel*, in order to sufficiently link Butler as the sender to clear the authentication hurdle. *See id.* Furthermore, the State failed to connect the substance of the telephone conversation to the content of the text messages. For example, Salas testified that Butler called her "in between the conversations talking mess," does not provide a sufficient link between Butler and the text messages to warrant the ultimate submission of the text message transcript to the jury. Thus, we conclude that the State did not make a prima facie showing of authenticity and the trial court's ruling of admissibility of State's Exhibit 57 was outside the zone of reasonable disagreement amounting to an abuse of discretion. *See Tillman*, 354 S.W.3d at 435.

9

Because we conclude that the trial court erred by admitting the unauthenticated text messages, we must now evaluate for harm. *See* TEX. R. APP. P. 44.2(b). Non-constitutional error "that does not affect substantial rights must be disregarded." *Id.* Substantial rights are not affected by the erroneous admission of evidence if, after we examine the record as a whole, we have fair assurance that the error did not influence the jury, or had but a slight effect. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). In assessing the likelihood that the jury's decision was adversely affected by the error, the appellate court should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case. *Id.* We may also consider jury instructions, the State's theory, and any defensive theories, closing arguments, and voir dire, if applicable. *Id.* Finally, we may consider the State's emphasis on the error as a factor. *See id.*

The record shows that Salas testified to details about her relationship with Butler prior to, during, and after the alleged offense, details about how Butler inflicted severe bodily injury on her during the alleged offense and how she was afraid of Butler. Salas also admitted during cross-examination that she signed a false written statement to Butler's attorney which absolved Butler of the charged offense and concocted another story regarding Salas being physically assaulted by two girls and not Butler. In addition to Salas's testimony, the State introduced Salas's hospital records immediately following the alleged offense, which corroborated her testimony at trial. While there may or not be legally sufficient evidence to support Butler's conviction, our harm analysis does not

10

end with a sufficiency-of-the-evidence analysis, nor do we conduct one here. Instead, we must examine whether there is a reasonable possibility that the evidence complained-of might have contributed to the conviction. *See Lopez v. State*, 288 S.W.3d 148, 178 (Tex. App.—Corpus Christi 2009, pet. ref'd) ("We are not concerned here with whether there was sufficient evidence on which [Lopez] could have been convicted without the evidence complained of. The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.") (quoting *Fahy v. Connecticut*, 375 U.S. 85, 86 (1963)).

The State's case relied heavily on Salas's testimony, which was put into serious question during cross-examination in light of Salas's written statement and changing of stories. Rather than attempt to rebut the defensive theory that Salas was being untruthful, the State shifted the jury's focus from Salas's veracity to Salas's present-sense fear of Butler as a result of the text messages. The content of text messages are riddled with vulgarities and threats on Salas's physical well-being. The trial court took note of the nature of the text messages by stating the following prior to their admission and outside the presence of Salas and the jury:

> I haven't had, in about 24 years of sitting on the bench, such a blatant attempt to coerce a witness. Now, I've heard some guys going to get you if you don't do something. That's all talk. I'm assuming this is a legitimate text. I'm not going to assume that it's for fun because we're not doing this for fun.

> And this—this witness (Salas) is something else. She's already made two completely different stories under oath as to what happened. That's, I think, my biggest concern. The other concern that I have is—is are we really trying—are we really trying and are we going to be getting to the truth in this case?

11

She's the one that was involved in it from the beginning as well as the defendant, and up until—up until now I was perfectly willing to let the jury decide who to believe.

We agree with the trial court's assessment of the text messages, and after examining the record as a whole, we do not have fair assurance that the error did not influence the jury, or had but a slight effect. *See Motilla*, 78 S.W.3d at 355. Accordingly, Butler's sole issue on appeal is sustained.[4]

### III.    CONCLUSION

We reverse Butler's conviction and remand this case for a new trial.

_____
GINA M. BENAVIDES,
Justice

Dissenting Memorandum Opinion by Justice Perkes.

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed the
27th day of March, 2014.

---

[4] In light of our conclusion that the trial court reversible erred on the issue of authentication, we do not address Butler's remaining argument that the text messages were irrelevant. *See* TEX. R. APP. P. 47.1.

12